976 F.2d 727
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
PRUDENTIAL LMI Commercial Ins. Co., Plaintiff-Appellant,
v.
COLLETON ENTERPRISES, Inc.; Hinesville Two, Incorporated,
d/b/a Econo Lodge, d/b/a Econo Mart; Summerville
Venture, Incorporated, Defendants-Appellees.
 No. 91-1757.
 United States Court of Appeals,
Fourth Circuit.
 Argued: February 7, 1992
Decided: October 5, 1992
 
 Appeal from the United States District Court for the District of South Carolina, at Charleston. Robert S. Carr, Magistrate Judge. (CA-90-2774-2-1J)
 ARGUED: Stephen P. Groves, Sr., Young, Clement. Rivers & Tisdale, Charleston, South Carolina, for Appellant.
 A. Arthur
 ON BRIEF: Ivan N. Nossokoff, Charleston, South Carolina, for Appellees.
 D.S.C.
 Reversed.
 Before RUSSELL, HALL, and PHILLIPS, Circuit Judges.
 PHILLIPS, Circuit Judge:
 
 OPINION
 
 1
 Prudential-LMI Commercial Insurance Company (Prudential) appeals a district court judgment holding Prudential liable to Colleton Enterprises (Colleton) for lost profits resulting from damage caused by Hurricane Hugo at Colleton's Econo Lodge in Ladson, South Carolina. The district court held that Colleton should recover under its insurance policy for profits it would have realized had the Econo Lodge been able to accommodate the influx of repair persons and construction workers in the Charleston area during the months after the hurricane. Because we believe the district court's decision misinterprets the policy and results in a windfall to Colleton that was not bargained for, we reverse.
 
 I.
 
 2
 In 1987 Prudential issued to Colleton a casualty insurance policy covering the Econo Lodge. The policy provided in Section A-Physical Damage to and Loss of Use of Motel Property, pursuant to Section IDescription of Property Covered:
 
 
 3
 Coverage C-Earnings When the insurance in this policy covers earnings, such insurance shall cover the loss of earnings sustained, less operating costs which do not necessarily continue during the necessary interruption of business, caused directly by the insured perils in this Section of the policy resulting in loss or damage to real or personal property at the described locations during the term of this policy. In the same section, the policy provided:
 
 
 4
 Definitions EARNINGS ARE DEFINED AS NET PROFIT PLUS EXPENSE, TAXES, INTEREST, RENTS AND ALL OTHER OPERATING EXPENSES EARNED BY THE BUSINESS.
 
 
 5
 In determining loss hereunder, due consideration shall be given to:
 
 
 6
 a.the earnings of the business before the date of damage or destruction and to the probable earnings thereafter, had no loss occurred....
 
 
 7
 In September of 1989, Hurricane Hugo caused extensive damage to the Econo Lodge and the surrounding area. Colleton made the following claim under the policy:
 
 
 8
 Damage to Building$271,231.32 Damage to Signs$2,300.00 Damage to Contents$149,247.25 Lost earnings Expenses, tax, interest and other operating expenses earned by the business$194,308.00 Net profit (net lost earnings)$192,254.00
 
 
 9
 Prudential paid all portions of the claim except the request for net profit or net lost earnings. Prudential took the position that it need not indemnify Colleton for lost profits because the Econo Lodge had recorded losses in excess of $350,000 during the 32-month period preceding Hugo and because the class of profits claimed-probable earnings resulting from accommodating the burgeoning demand due to the hurricane-was not covered under the policy.
 
 
 10
 Having reached impasse on the question, the parties stipulated that Prudential would bring a declaratory judgment action to resolve it. The parties narrowed the question for the court with two important factual stipulations. First, that Hurricane Hugo had caused the damage at the Econo Lodge; second, that if the court found Colleton's lost profit claim covered under the terms of the policy, Colleton should be awarded $192,254, the amount of net profit the Econo Lodge would have realized had it been able, after the hurricane, to accommodate the increased demand for motel rooms that the occurrence of that peril caused.
 
 
 11
 The district court gave judgment in favor of Colleton in the sum of $192,254.[1] This appeal followed.
 
 II.
 
 12
 Before addressing the merits of Colleton's claim, we outline briefly the general principles underlying business interruption insurance and the controlling rules of insurance contract interpretation applicable here.
 
 A.
 
 13
 The insurance provisions at issue provide what is termed "business interruption" or "use and occupancy" coverage. Generally, business interruption insurance "is designed to do for the insured in the event of business interruption caused by [an insured peril], just what the business itself would have done if no interruption had occurred-no more.... " National Union Fire Ins. Co. v. Anderson-Prichard Oil Corp., 141 F.2d 443, 445 (10th Cir. 1944).
 
 
 14
 The interpretation of the policy at issue is governed by South Carolina law. Johnston v. Commercial Travelers Mut. Acci. Asso., 131 S.E.2d 91, 94-95 (S.C. 1963). We must interpret the insurance policy according to the general rules of contract construction. Standard Fire Ins. Co. v. Marine Contracting and Towing Co., 392 S.E.2d 460, 461 (S.C. 1990). While South Carolina law requires us to interpret policy terms most liberally in favor of the insured, McCracken v. Government Employees Insurance Co., 325 S.E.2d 62, 64 (S.C. 1985), we are nevertheless constrained by the mutually manifested intent of the parties. General Ins. Co. v. Palmetto Bank, 233 S.E.2d 699, 701-702 (S.C. 1977). In litigating a claim under a business interruption policy, "the burden is on the insured to establish the extent of the damage caused by the interruption, and the applicability of the policy thereto." Howard Stores Corp. v. Foremost Insurance Co., 441 N.Y.2d 674, 676 (1981) (quoting Couch on Insurance 2d,s 57:32).
 
 
 15
 In order to establish coverage for lost profits or lost earnings under business interruption coverage provisions, the insured must establish that: (1) the peril insured against occurred, Hart-Bartlett-Sturtevant Grain Co. v. Aetna Insurance Co., 293 S.W.2d 913 (Mo. 1956); (2) the peril caused damage to the business facility insured, National Children's Expositions Corp. v. Anchor Insurance Co., 279 F.2d 428, 430 (2d Cir. 1960); (3) the damage resulted in a partial or complete interruption of business, Pacific Coast Engineering Co. v. St. Paul Fire & Marine Insurance Co., 88 Cal. Rptr. 122, 124 (Cal. Ct. App. 1970); and (4) the business suffered a loss of earnings or profits as a direct result of the business interruption. Id.; see also, Ramada Inn Ramogreen, Inc. v. Travelers Indemnity Co., 835 F.2d 812 (11th Cir. 1988) (hotel cannot recover for decreased occupancy that resulted from fire damage to adjoining restaurant).
 
 B.
 
 16
 The parties agree that Colleton has established the first three elements of a business interruption claim for lost earnings. The only question is whether the specific lost profits claimed by Colleton qualify for coverage under the fourth prong above: that is, did the lost opportunity to house the influx of temporary residents after the hurricane constitute a loss of earnings cognizable under a policy that is designed to return the Econo Lodge to the position it would have occupied had the hurricane not occurred?
 
 
 17
 The most critical guidance on this interpretive issue is found in the earlier-quoted policy provision that "in determining [earnings] loss ... due consideration shall be given to: (a) the earnings of the business before the date of damage or destruction and to the probable earnings thereafter, had no loss occurred"; and in this provision, the most critical language bearing upon the specific issue in this case is the clause, "had no loss occurred."
 
 
 18
 In effect, this provision identifies the most relevant evidence on the question of "just what the business itself would have done if no interruption had occurred-no more," which, as indicated, is the proper measure of business interruption coverage in any case. See AndersonPrichard Oil Corp., 141 F.2d at 445. Ordinarily, the strongest and most reliable evidence of what the business "would have done" is likely to be what it "had been doing" in the period just before an interruption. Not only has this obvious probative force, but this information is likely always to be readily accessible and verifiable.
 
 
 19
 Were evidence of such pre-casualty experience the only way to prove a lost-earnings claim, however, Colleton's claim of lost profit here would flatly fail, for evidence would show that the Econo Lodge had operating losses over the 32 months just preceding the hurricane.[2] For obvious reasons, however, an insured is not so limited under this type provision. As the quoted provision indicates, he may also rely on evidence that, without regard to what he had been doing, and even if he had been doing badly-losing money rather than earning a profit-he nevertheless would have earned a profit during the period of interruption had it not occurred. See, e.g. National Union Fire Ins. Co. v. Scandia of Hialeah, Inc., 414 So.2d 533, 534 (Fla. App. 1982) (so construing comparable provision). Thus, he might prove that a general economic up-turn for the business had been imminent, see id., or that a specific event had created a profit opportunity which the peril's occurrence had thwarted. See General Insurance Co. v. Pathfinder Petroleum Co., 145 F.2d 368, 371 (9th Cir. 1944) (plans for plant construction within destroyed premises thwarted).
 
 
 20
 For understandable reasons, where an insured attempts to rely on post-interruption profit expectancies rather than pre-interruption earnings realities, courts have required proof of probabilities rather than mere possibilities, and on practical rather than theoretical assessments of the probabilities. See Fidelity-Phenix Fire Ins. Co. v. Benedict Coal Corp., 64 F.2d 347, 353-54 (4th Cir. 1933). And, in assessing attempted proof of such a claim, the critical question is the causation question that ultimately defines business interruption coverage: would the specifically identified earnings source in fact have produced earnings "had the [insured] loss not occurred." Only by holding firm to this causation requirement can business interruption coverage be confined-as manifestly intended-to indemnification for "what the business itself would have done if no interruption had occurred-no more", Anderson-Prichard, 141 F.2d at 445. A failure to do so can lead to the unacceptable result of putting the insured in a better position than it would have occupied had the interruption not occurred-a result not contemplated by business interruption insurance.
 
 
 21
 It is on this causation requirement that Colleton's lost-net-profit claim fails. The claim is that, had the hurricane not damaged the insured motel, Colleton would have been able, during the period of business interruption that followed it, to profit from the influx of temporary residents-relief workers and the like-that the same hurricane brought to the area.
 
 
 22
 Merely to state the claim is to confirm its intuitively-sensed logical flaw and its unreasonableness as a reflection of what the contracting parties rightly could have expected respecting policy coverage. It would allow the insured to have it both ways-by failing to carry the premise of the interrupting peril's non-occurrence all the way through proof of "what the business would have done" in the circumstance. This simply will not do. For had the hurricane not occurred (the policy's built-in premise for assessing profit expectancies during a business interruption), neither would the specifically claimed earnings source have come into being. To allow the claim therefore would be to confer a windfall upon the insured rather than merely to put it in the earnings position it would have been in had the insured peril not occurred. Business interruption insurance of the type in issue here is not intended to provide such windfall coverage. See, e.g., Northwestern States Portland Cement Co. v. Hartford Fire Insurance Co., 360 F.2d 531, 534 (8th Cir. 1966).
 
 
 23
 The limiting principle that we apply here is but a special application of the general no-windfall principle. It is that an insured under a business interruption provision such as that here in issue may not claim as a probable source of expected earnings (or operational expenses) a source that would not itself have come into being but for the interrupting peril's occurrence. See Eastern Associated Coal Corp. v. Aetna Casualty & Surety Co., 632 F.2d 1068, 1078-79 (3d Cir. 1980) (principle applied to prevent recovery of"an expense which is newly created by the interruption").
 
 
 24
 Application of this principle will not prevent-and serves to distinguish-rightful recoveries where the source of expected profit (or expense) is one not itself created by the interrupting peril. See, e.g., Pathfinder Petroleum Co., 145 F.2d at 371 (lost earnings from thwarted plans for construction in destroyed premises). But this principle rightly prevents windfall recoveries of the type sought here.
 
 III.
 
 25
 Because we conclude that, as a matter of law on the stipulated facts of record, the business interruption provision here in issue did not cover the specific claim for loss of net-profit from the peril-generated source relied upon, we reverse the judgment of the district court.
 
 REVERSED
 HALL, Circuit Judge, dissenting:
 
 26
 Because I believe that the district court correctly ruled that the insurance contract covered the lost profits claimed by Colleton, I respectfully dissent.
 
 
 27
 The majority persists in framing the issue as what the motel's situation would have been had the hurricane not occurred at all. However, the contract states that "due consideration" be given to pre-damage earnings and "the probable earnings thereafter, had no loss occurred " (emphasis added). "Had no loss occurred" does not refer to the overall loss in the surrounding area; rather, it clearly refers only to the loss incurred by the insured. The parties stipulated that, had the motel not been put out of commission by Hurricane Hugo, the motel would have realized a profit of $192,000 in the months after the storm.
 
 
 28
 The majority acknowledges that proof of an imminent general economic up-turn, or of a lost profit opportunity thwarted by the losscausing event, can justify recovery under a lost-earnings provision. See slip op. at 7. I assume, then, that had the motel been destroyed by an isolated fire the day before Hugo hit, the majority would rule that lost profits would have been recoverable because the cause of the property loss (the fire) was not the same as the cause of the profit opportunity (the storm). Similarly, if gold were discovered the day after Hugo and the entire region filled with gold seekers (as well as relief workers), I assume that lost profits would be covered. Colleton had a lost profit opportunity (the dimensions of which the parties stipulated). Although Hugo caused both the property loss and created the profit opportunity, it does not strike me as an"intuitively-sensed logical flaw" to permit recovery under these circumstances.
 
 
 29
 I would affirm.
 
 
 
 [1]
 Our reading of the district court's memorandum opinion suggests that the court may have misunderstood the narrow question presented in this action. The court made the following two findings or conclusions of law:
 
 
 [12]
 It is admitted that the insurance contract in this case provides coverage for earnings and that earnings are defined by the policy as "net profit plus expense, taxes, interest, rents and all other operating expenses earned by the business."
 ...
 
 
 [14]
 There is insufficient evidence before the court to determine the amount of "net profit", if any, to which the defendant may be entitled, however to the extent that there remain"expense, taxes, interest, rents and other operating expenses earned by the business" which were not included in the $194,308 payment made by the plaintiff to the defendants, the plaintiff is liable therefor up to the amount of $192,254
 This language suggests that the district court misapprehended the only legal issue presented to it: whether Colleton's specific claim for net profit loss was covered by the terms of the policy. Prudential had already indemnified Colleton in the amount of $194,308 for "expenses, tax, interest and other operating expenses earned by the business." The question put was whether in addition to recouping these "operating expenses," Colleton should also be indemnified for a "net profit," beyond those expenses, that it was prevented from earning as a result of the hurricane.
 
 
 [2]
 On this point, Prudential's position, as we read it, seems confusingly ambivalent. At one point, Prudential seems to contend that a pre-casualty loss history absolutely precludes any lost-profit recovery; but at another, Prudential seems to concede that post-casualty profit potential might nevertheless be shown. Colleton, as confusedly, may be thought to contend that by the latter concession Prudential has effectively conceded the case-that the specific hurricane-generated profit claim made was one covered by the policy
 We decline to read any such dispositive effect in the admittedly confusing litigation position taken in Prudential's argument on this appeal.